**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**KRISTIAN HANSEN,**

               **Petitioner,**

       **v.**                      **9:04-CV-574**
                                      **(GLS)**

**JOSEPH SMITH,**

               **Respondent.**

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PETITIONER:**

Office of Joseph W. Carbonaro      **JOSEPH W. CARBONARO**, **ESQ.**
275 Madison Avenue
Suite 1605
New York, New York 10016

**FOR THE RESPONDENT:**

**HON. ANDREW M. CUOMO**       **THOMAS B. LITSKY, ESQ**.
Attorney General for the State of New York   Assistant Attorney General
Attorney for Respondent
120 Broadway
New York, New York 10271

**GARY L. SHARPE**
**UNITED STATES DISTRICT JUDGE**

<u>**Decision and Order**</u>

**I.** <u>**Introduction**</u>

     Petitioner Kristian Hansen is currently an inmate in the custody of the

New York State Department of Correctional Services at Shawangunk Correctional Facility.  He was convicted on August 16, 1999 of first degree murder (N.Y. PENAL LAW §125.27 (1)(a)(vii)) and first degree robbery (N.Y. PENAL LAW § 160.15(2)) after a jury trial in Albany County and is presently serving an aggregate sentence of life in prison without parole. Dkt. No. 1, Pet. at 1; Dkt. No. 10, Respondent's Memorandum of Law ("Resp't Mem."), at 1.

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that: (1) the trial court erred when it denied his motion to dismiss the indictment on the ground that the prosecutor misled the grand jury regarding co-defendant Melissa Davis's cooperation agreement; (2) a gun and Petitioner's statement to police should have been suppressed because police entered his home without a warrant or consent; (3) the trial court erred when it failed to admit Davis's statement to a third party as substantive evidence, resulting in the denial of Petitioner's right to present witnesses; and (4) the trial court's failure to apply the same sentencing criteria to non-capital first-degree murder cases as to capital murder cases denied Petitioner due process and equal protection.  Dkt. No. 1 at 5-6; Dkt. No. 21, Reply Memorandum ("Reply Mem."), at 7-19; Resp't

2

Mem. at 17-29.  For the reasons that follow, the petition is **denied**.

## II. Background

### A. Facts

According to the testimony adduced at trial, in July and early August 1996, Melissa Davis lived in the upstairs unit of a two-family home owned by her parents located at 499 Third Street in Albany, New York. Transcript of Trial of Kristian Hansen ("Trial Tr.") at 376-77. The unit had its own entrance. *Id.* Petitioner frequently stayed with Davis. *Id.* at 377.

During the evening of July 31, 1996, Petitioner talked to Davis about a $300.00 debt they owed a drug dealer. Trial Tr. at 320-21, 378-79.  Davis and Petitioner discussed ways to satisfy the debt, and Petitioner suggested that they rob a cab driver. *Id.* at 321, 379-80. Petitioner was carrying a .25 caliber handgun that Davis stole from her mother.  *Id.* at 379.  He purchased ammunition for the gun at a local K-Mart store approximately two weeks prior to the incident.  *Id.* at 380.

Davis and Petitioner chose an address on Morris Street and at approximately 3:00 a.m., Davis called for a cab to meet them there from a payphone in front of a nearby drugstore.  She used a telephone number Petitioner gave her. Trial Tr. at 85-86, 90-93, 321, 382. When Davis hung

3

up the phone, Petitioner told her, "Now, when we go in there I'm going to shoot him and you take his wallet." *Id.* at 382.

When the cab arrived, Davis got into the front seat and Petitioner got into the back seat behind the driver, Santo Cassaro.  Davis heard Petitioner say something to Cassaro and then "the gun went off". Trial Tr. at 383-85, 404-05. Petitioner told Davis to "[g]rab his wallet", and Davis moved Cassaro's arm and reached into his pocket to get his wallet. *Id.* at 385. Davis and Petitioner fled. *Id.* at 322, 386.

At approximately 4:00 a.m., Davis and Petitioner went back to Davis's apartment, but the door was locked and Davis did not have her key. Trial Tr. at 386-88. They eventually went to a friend's house. *Id.* at 407-08. At approximately 8:00 a.m., Davis and Petitioner returned to Davis's apartment.  *Id.* at 388, 408.  Petitioner put the gun on top of the computer in the livingroom, and Cassaro's wallet was put in a trash bag in Davis's room. *Id.* at 322, 388.

At approximately 4:30 a.m, Cassaro was found dead inside his cab in front of 686 Morris Street in Albany. Trial Tr. at 94-95, 98-103, 118-21. Police recovered a .25 caliber shell casing from the floor of the cab.  *Id.* at 141-42, 161.  Dr. Jeffrey Hubbard testified that Cassaro died of a gunshot

wound to the back of his head.  *Id.* at 508. Dr. Hubbard determined that the

bullet entered the back right side of Cassaro's head and traveled downward

and to the left through his cerebellum, exited the skull bone on the lower left

side, and lodged in the soft tissue below and forward of the left ear.  *Id.* at

498-501. A projectile was removed from Cassaro and transported to the

New York State police crime laboratory for testing.  *Id.* at 153-56.

Detective Joseph Severence of the Albany Police Department

received information that a few days before the shooting, Petitioner was

looking for ammunition for a .25 caliber automatic handgun.  Trial Tr. at 292.

Detective Severence spoke to Detective Gustavo Flores, who had prior

dealings with Petitioner.  Detectives Severence, Flores, and Charles

Mulrooney went to 499 Third Street to speak to Petitioner about his possible

possession of a gun.  *Id.* at 197, 293, 356-57. The detectives went up the

front stairs of the house and opened a double screen door and the inside

door into the hallway.  *Id.* at 294-95.  They knocked on the first floor door,

and an occupant of the apartment told them Petitioner was upstairs.  *Id.* at

295.  The detectives proceeded up the stairs and knocked on the second

floor door.  Petitioner stepped out into the hallway and agreed to

accompany police to the station.  *Id.* at 295, 357.  Petitioner wanted the

detectives to handcuff him because he did not want to be seen voluntarily accompanying them.  *Id.* at 200-01, 295-96, 356. The detectives refused but permitted Petitioner to place his hands in front of him with a sweatshirt over them.  *Id.* at 295-96, 357.

When the detectives and Petitioner arrived at the police station, Petitioner was given his *Miranda*[1] warnings.  Trial Tr. at 203-05, 297-302. Initially, he told police that although he possessed a .25 caliber gun, he had thrown it into the Hudson River.  *Id.* at 205-07, 302-03. Detective Mulrooney confronted Petitioner, telling him it did not make sense to throw away a gun unless he had used it. *Id.* at 206, 358-59, 362-63. Petitioner began to cry and admitted he shot Cassaro and told police where to find the gun. *Id.* at 205, 318-23, 360-64, 359-62.  According to Petitioner, he got into the back seat of the cab behind Cassaro, pointed the gun at his head and demanded money.  Cassaro moved his arm and the gun "went off."  *Id.* at 321. Petitioner told police that he reached over the front seat and took Cassaro's wallet from his right back pocket before fleeing.  *Id.* at 322.

Davis was in the downstairs unit of 499 Third Street talking to Francine Vero on the phone when the detectives left with Petitioner.  Trial

---

[1]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

Tr. at 389-90, 412, 414.  During their conversation, Davis told Vero that she had been involved in the shooting, but denied having told Vero that she, and not Petitioner, shot Cassaro. *Id.* at 390, 414-16.  After Petitioner left, Davis believed "it was just a matter of time" before the police returned to arrest her.  Trial Tr. at 418.  She went to her room and retrieved marijuana which she then took to a friend's house. *Id.* at 389, 418-19, 423.  At some point during the day,[2] Davis asked her cousin to put the gun and its ammunition in the ceiling.  *Id.* at 410, 419-21. At approximately 9:00 p.m., Davis turned herself in to detectives who were waiting outside her apartment.  *Id.* at 390-91.

Davis admitted at trial that she carried the gun with her for at least two weeks prior to the shooting, that during that time the gun was unloaded, that she had fired the gun once in the past, and that she owed money to a drug dealer for marijuana.  *Id.* at 395-97.  In exchange for her cooperation with police against Petitioner, Davis pleaded guilty to first degree robbery and received a sentence of three to nine years in prison.  *Id.* at 430-32.

Police obtained a search warrant for 499 Third Street.  They

---

[2] It is not clear from the record whether Davis hid the gun before or after Petitioner left the apartment with the detectives.

recovered a .25 caliber gun and ammunition inside a paper bag from a hatch area in the ceiling of a second floor hallway that led to a crawl space. Trial Tr. at 214, 245, 247, 255, 262. New York State Police Technical Sergeant Charles E. Boone, Jr. testified that the bullet recovered from Cassaro was fired from the .25 caliber gun recovered from 499 Third Street. *Id.* at 153, 468-70. Boone also testified that the gun had a trigger pull of seven and one-half pounds, which he described as "in the moderate to slightly heavy range" for firearms of its size. *Id.* at 466-67. Police also recovered Cassaro's wallet from a garbage bag in front of Davis's home. *Id.* at 214, 245, 265-68.

### B. State Court Proceedings

An Indictment was returned by an Albany County grand jury charging Petitioner with one count of first degree murder (N.Y. PENAL LAW § 125.27(1)(a)(vii)), three counts of second degree murder (N.Y. PENAL LAW §§125.25(1), (2), (3)) and two counts of first degree robbery (N.Y. PENAL LAW §§ 160.15(2), (3)). Dkt. No. 21, Appendix to Reply Brief ("Appx.") at A7-A12.[3]

---

[3] One of the two counts of first degree robbery related to a separate April 1995 robbery of cab driver David Goyette. That count was severed from the indictment prior to the trial for the Cassaro murder. Resp't Mem. at 2 n.1. On April 26, 1999, Petitioner pleaded guilty to this count and was sentenced on September 27, 1999, to an indeterminate term of five to fifteen years in

The Honorable Larry J. Rosen presided over Petitioner's trial proceedings.  A combined *Huntley*[4]/Mapp[5] hearing was held on October 5, 1998.  *See* Transcript of Suppression Hearing ("Hearing Tr."), 10/5/98, at 5-233.  In a written decision dated August 2, 1999, Judge Rosen ruled that there had been "no error in the police entry into 499 Third Street."  Dkt. No. 11, Ex. A (Decision and Order, 8/2/99, Rosen, J.) at 6.  The court also found that Petitioner was "not in custody" when he voluntarily "agreed to accompany the police to the police station."  *Id.*  The court noted that Petitioner asked that he be handcuffed to "create the illusion that he was in custody",  *Id.* at 6-7 (emphasis in original), and that he did not perceive himself to be in custody under these circumstances.  Since Petitioner had been given his *Miranda* warnings, and knowingly waived them, his written and oral statements were ruled admissible.  *Id.* at 6-7.  Finally, the court

---

prison.  Transcript of Plea ("Plea Tr."), 4/26/99, at 3-13.  The trial court ordered the sentence to run consecutively to the life sentence imposed for first degree murder. Resp't Mem. at 2 n.1; Appx. at A-321-23. Petitioner does not appear to be challenging this conviction.

  [4]  *People v. Huntley,* 204 N.E.2d 179 (N.Y.1965). A *Huntley* hearing is conducted to determine whether a defendant's statements to the police must be suppressed on the grounds that he was subjected to custodial interrogation without the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Harris v. New York*, 202 F. Supp. 2d. 3, 4 & n.3 (S.D.N.Y. 2001); *see also* N.Y. CRIM. PROC. LAW ("CPL") § 710.

  [5]  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  A *Mapp* hearing is conducted to determine whether evidence sought to be used against a defendant at trial was obtained illegally. *See Edwards v. Mazzuca*, No. 00 Civ. 2290, 2007 WL 2994449, at *9 n.4 (S.D.N.Y. Oct. 15, 2007).

ruled that Petitioner lacked standing to challenge the admission into evidence of the victim's wallet, and that the gun recovered from 499 Third Street was seized pursuant to a valid search warrant. *Id.* at 7-8. Petitioner's motions were denied.

A jury trial began on August 9, 1999 and concluded on August 16, 1999. Petitioner called two witnesses to testify in his behalf. Francine Vero testified that Davis called her at approximately 6:00 p.m. on August 1, 1996 and that the two had what started as a "normal conversation." Trial Tr. at 551. Vero testified that Davis told her that she "killed a taxi driver." *Id.* at 552. After speaking to a priest, Vero reported the conversation to police. *Id.* at 554-55. James Ruszas, a latent fingerprint examiner for the New York Division of Criminal Justice Services, testified that he compared latent fingerprint lifts taken from Cassaro's cab to Petitioner's and Davis's fingerprints, and none matched either person. *Id.* at 561-64, 573-74.

The jury convicted Petitioner of first degree murder and first degree robbery. Trial Tr. at 728-29. On September 27, 1999, Petitioner was sentenced to serve life without parole for murder and a concurrent indeterminate term of twelve and one-half to twenty-five years in prison for robbery. Dkt. No. 1 at 2; Resp't Mem. at 8.

On January 17, 2002, the Appellate Division, Third Department, affirmed Petitioner's conviction and sentence. *People v. Hansen*, 736 N.Y.S.2d 743 (N.Y. App. Div. 2002).  The New York Court of Appeals granted leave and affirmed on February 13, 2003. *People v. Hansen*, 786 N.E.2d 21 (N.Y. 2003).

### C. This Action

On May 21, 2004, a petition was filed in this District seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Dkt. No. 1. On December 21, 2004, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed a response, memorandum of law, and relevant state court records in opposition to the petition. *See* Dkt. Nos. 10-11.  On October 23, 2007, Petitioner's attorney, Joseph W. Carbonaro, Esquire, filed a reply brief and appendix.  Dkt. Nos. 21-27.

### III. Discussion

#### A. Timeliness

As an initial matter, Respondent claims that the petition is untimely. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for prisoners to seek federal review of their state court criminal convictions. 28 U.S.C. § 2244(d)(1).  The

one-year period generally begins to run from the date on which the state criminal conviction became final by the conclusion of direct review or by the expiration of the time to seek direct review. *Id.* at § 2244(d)(1)(A).[6] The Second Circuit has held that for purposes of 28 U.S.C. § 2244, a state conviction becomes "final" when certiorari is denied by the United States Supreme Court or when the time to seek certiorari has expired, which is ninety days after the date direct review of the case has been completed by the highest court in the state. *Williams v. Artuz,* 237 F.3d 147, 151 (2d Cir. 2001). The one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]"  28 U.S.C. § 2244(d)(2). The tolling provision " 'excludes time during which properly filed state relief applications are pending,' but it does not restart the statute of limitations clock." *Williams v. Breslin*, No. 03 Civ. 1848, 2004 WL 242447, at *2 (S.D.N.Y. Feb. 11, 2004) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17

---

[6] Other dates from which the limitations period may start running are the date on which an unconstitutional, state-created impediment to filing a habeas petition is removed, the date on which the constitutional right on which the petitioner bases his habeas application was initially recognized by the Supreme Court if the right was newly recognized and made retroactively applicable, or the date on which the factual predicate for the claim or claims presented could have been discovered through the exercise of due diligence (newly discovered evidence). 28 U.S.C. § 2244(d)(1)(B), (C), and (D).  None of the alternative dates apply in this case.

(2d Cir. 2000)(*per curiam*)).

Petitioner's conviction became "final" for purposes of AEDPA on May 14, 2003, ninety days after the New York Court of Appeals affirmed Petitioner's conviction. Petitioner had until May 14, 2004 to file a timely petition.  He does not claim that any post-conviction motions were filed between May 14, 2003 and May 14, 2004 and, therefore, statutory tolling does not apply. This petition was signed on May 13, 2004, but was not filed until May 21, 2004, several days after the one-year statute of limitations had run.

If Petitioner were acting *pro se*, he would be entitled to the benefit of the "prison mailbox rule."  *Pro se* litigants are dependent on the prison mail system to assure timely filing of petitions.  The prison mailbox rule provides that a *pro se* petition is deemed "filed" at the time it was delivered to "prison authorities for forwarding to the court clerk."  *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir. 2001).  But here, Petitioner was represented by counsel, who signed the petition, and there is no indication that Petitioner presented the petition to prison officials for mailing. *See* Dkt. No. 1 at 7; Dkt. No. 21 at 2 ("Hansen executed the petition on May 13 and it was subsequently forwarded to this Court . . .").  The

13

prison mailbox rule therefore does not apply. *Noble*, 246 F.3d at 96 (prison mailbox rule is justified by the prisoner's dependence on the prison mail system and the lack of counsel); *Collins v. Artus*, 496 F. Supp. 2d 305, 311 n.4 (S.D.N.Y. 2007)(prison mailbox rule did not apply to a petitioner's motion to vacate conviction because it was filed with the assistance of counsel); *Atkinson v. United States*, No. 05-CV-286, 2005 WL 3555946, at *3 (N.D.N.Y. Dec. 28, 2005)(McAvoy, S.J.)("Petitioner's counsel, undisturbed by the restraints that would beset an incarcerated individual, had control over where and when the petition would be filed, and had the freedom and responsibility to follow the Federal Rules of Civil Procedure. He failed to do so . . . The fact that Petitioner might have presented his papers to his attorney in a timely fashion does not save his claim.")(internal citations omitted).

Although the AEDPA does not provide that the statute of limitations may be tolled for any reasons other than the pendency of a state post-conviction motion, in "rare and exceptional circumstances," the court may equitably toll the limitations period. *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)(quoting *Smith*, 208 F.3d at 17 (internal quotation marks and citations omitted)).  In order to warrant equitable tolling, a petitioner must

14

show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008)(quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)) (internal quotation marks omitted); *see also Lawrence v. Florida*, 127 S. Ct. 1079, 1085 (2007)(assuming without deciding that equitable tolling applies to otherwise untimely habeas claims because the parties agreed that it did, a petitioner must show that he diligently pursued his rights and that extraordinary circumstances prevented him from filing on time).

There is no indication in the record of extraordinary or unusual circumstances that would justify equitable tolling in this case. Counsel argues that the one-year time limitation begins to run when a petitioner receives notice of the state court's final decision and order that closes the door to further appellate review. Dkt. No. 21, Reply Mem., at 2; Dkt. No. 22 (Affidavit of Kristian Hansen); Dkt. No. 24 (envelope stamped February 24, 2003). Since Petitioner received notice of the Court of Appeals's decision affirming his conviction on February 24, 2003, counsel argues that the limitations period should be extended to May 24, 2004.  Dkt. No. 21 at 2.

The statute, however, is clear that the one-year period runs from "the *date* on which the judgment became final by the conclusion of direct review

15

or the expiration of the time for seeking such review."  28 U.S.C. §

2244(d)(1)(A)(emphasis added); *see Thompson v. Smith*, No. 06-CV-1253,

2006 WL 1455461, at *2 (E.D.N.Y. May 22, 2006)(even if petitioner did not

receive notice of the Court of Appeals' order denying his direct appeal leave

application, the relevant date for statute of limitations purposes is the date

of the order, not the date upon which the order is received by the petitioner)

(citing *Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000) (AEDPA limitations

period began running again upon the Appellate Division's denial of leave to

appeal, not from the date on which petitioner received notice of the

Appellate Division's order)); *see also Howard v. Ercole*, No. 99-CV-096,

2007 WL 2406924, at *8 (N.D.N.Y. Aug. 21, 2007)(Sharpe, J., adopting

Report - Recommendation of Bianchini, M.J.)("The habeas limitation period

runs, not from the time when the petitioner is served with a document, but

rather from " 'the date on which the judgment becomes final.' ")(quoting 28

U.S.C. § 2244(d)(1)).[7]

---

[7]Counsel's reliance on *Johnson v. United States*, 544 U.S. 295 (2005) in support of his "notice" argument is misplaced. The petitioner in *Johnson* attacked his federal sentence pursuant to 28 U.S.C. § 2255 on the ground that a state conviction used to enhance the federal sentence had been vacated. The Supreme Court decided the "distinct issue of how soon a prisoner, successful in his state proceeding, must challenge the federal sentence under § 2255." *Id.* at 304. The Court held that the one - year limitation period under section 2255 (4) began to run from the date the petitioner "receives notice of the order vacating the prior [state predicate] conviction, provided he has sought it with due diligence in state court, after entry of judgment in the federal case with the enhanced sentence." *Id.* at 298. Since *Johnson* involves a federal petition and the

Even if the period of time between the date of the Court of Appeals decision and Petitioner's receipt could be characterized as an extraordinary circumstance,[8] Petitioner has not shown that he acted with "reasonable diligence" to justify equitable tolling.  Although Petitioner states that he made diligent efforts to pursue his habeas petition and to hire an attorney to do so, he has provided no evidence to support these conclusory claims. *See Collins*, 496 F. Supp. 2d at 313 ("To establish extraordinary circumstances, a petitioner must support his allegations with evidence; he cannot rely solely on personal conclusions or assessments."). Since the petition is untimely, and there is no factual basis presented that would

---

interpretation of section 2255(4), it is inapposite.

To the extent that Petitioner is arguing that the reasoning in *Johnson* applies by analogy to petitioners challenging state court convictions under section 2254, that claim also fails. The language of section 2255 (4) is similar to the so-called "newly discovered evidence" exception to the one-year limitation under section 2244(d)(1)(D). This provision applies only to claims for which the factual predicate upon which the habeas claim is based was not known or reasonably discoverable at the time the petitioner's conviction became final. *Shuler v. Spitzer*, No. 05-CV-0932, 2007 WL 1704644, at *5 (E.D.N.Y. Jun. 13, 2007). This case does not involve new evidence that was not discovered until after Petitioner's conviction became final. Section 2244(d)(1)(D) therefore does not apply.

[8]In the context of section 2244(d)(2), a petition is subject to statutory tolling while a properly filed state court post-conviction or collateral review application is pending, but the interval between the entry of the state court order and its receipt a few days later after prompt mailing is not subject to tolling. *Diaz,* 515 F.3d at 155. The Second Circuit has held that this period may be equitably tolled in circumstances where the state court fails to send notice of its decision within a reasonable time after entry of an order completing a prisoner's collateral attack and the petitioner makes a reasonably prompt inquiry into the status of the case. *Id. at* 155. Here, even assuming this analysis applies outside the context of section 2244(d)(2), there was no unreasonable delay between the date of the Court of Appeals's decision completing direct review (February 13, 2003), and the date upon which Petitioner is alleged to have received notice of the decision (February 24, 2003).

17

warrant equitable tolling, Petitioner's petition is time barred and subject to

dismissal on this basis.

Assuming, *arguendo*, that the petition was timely, it fails on the merits

for the following reasons.

## B.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), a federal court may not grant *habeas* relief to a state prisoner

on a claim unless the state courts adjudicated the merits of the claim and

such adjudication either

> 1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> 2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d); *Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006);

*DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*,

322 F.3d 171, 177-78 (2d Cir. 2003).[9] In providing guidance concerning

application of this test, the Second Circuit has recently noted that:

> [A] state court's decision is "contrary to" clearly established federal

---

[9] It should be noted that "clearly established federal law" in this context "refers only to the holdings of the Supreme Court." *Rodriguez v. Miller*, 499 F.3d 136, 140 (2d Cir. 2007) (citing *Williams v. Taylor,* 529 U.S. 362, 412 (2000)).

law if it contradicts Supreme Court precedent on the application of a
legal rule, or addresses a set of facts "materially indistinguishable"
from a Supreme Court decision but nevertheless comes to a different
conclusion than the Court did. [*Williams*, 529 U.S.] at 405-06; *Loliscio
v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001).... [A] state court's
decision is an "unreasonable application of" clearly established
federal law if the state court "identifies the correct governing legal
principle from [the Supreme] Court's decisions but unreasonably
applies that principle to the facts" of the case before it. *Williams*, 529
U.S. at 413.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams,*
237 F.3d at 152 (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir.
2000)).

Significantly, a federal court engaged in habeas review is not charged
with determining whether the state court's determination was merely
incorrect or erroneous, but instead whether such determination was
"objectively unreasonable." *Williams*, 529 U .S. at 409; *see also Sellan v.
Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001). Objectively unreasonable in
this context has been interpreted as meaning that " 'some increment of
incorrectness beyond error' " is required for the habeas court to properly
grant the application. *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006)
(quoting *Francis S.*, 221 F.3d at 111).

If a state court does not adjudicate a petitioner's federal claim "on the
merits," the state court's decision is not entitled to AEDPA deference and

19

instead, the federal *habeas* court must apply the pre-AEDPA standard of *de novo* review to the state court's disposition of the federal claim. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003)(citing *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)).

### C. Failure to Present Exculpatory Evidence to the Grand Jury

Petitioner first claims that the trial court improperly denied his motion to dismiss the indictment on the ground that the prosecutor did not instruct the grand jury that Davis "was testifying pursuant to a cooperation agreement", and that the prosecutor misled the grand jury about the existence of the cooperation agreement.  Dkt. No. 1, at 5.

Alleged errors in a state grand jury proceeding, including claims that a prosecutor failed to present exculpatory evidence to the grand jury, are not cognizable on federal habeas review.  *Lopez v. Riley,* 865 F.2d 30, 32-33 (2d Cir. 1989)("The particular claims of impropriety before the grand jury in this case concern the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law" which were cured by petitioner's conviction by a "petit jury" and, therefore, were not cognizable on habeas review); *see United States v. Williams*, 504 U.S. 36, 51 (1992) ("[R]equiring

the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body[.]"); *Warren v. Ercole*, No. 07 Civ 3175, 2007 WL 4224642, at *10 (E.D.N.Y. Nov. 27, 2007)("[F]ederal law does not require a prosecutor to present exculpatory evidence to a grand jury."); *Van Stuyvesant v. Conway*, No. 03 Civ. 3856, 2007 WL 2584775, at *25 (S.D.N.Y. Sept. 7, 2007)(claim that false testimony was presented before the grand jury is not cognizable on habeas review).

Even if there were error, Petitioner's subsequent conviction by a jury cured any arguable defects in the indictment process "because the trial conviction establishes probable cause to indict and also proof of guilt beyond a reasonable doubt." *Montalvo v. Annetts*, 02 Civ. 1056, 2003 WL 22962504, at *17 (S.D.N.Y. Dec. 17, 2003); *see United States v. Mechanik,* 475 U.S. 66, 70 (1986) ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."); *Davis v. Mantello*, 42 Fed. Appx. 488, 490-91 (2d Cir. 2002) (summary order) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal

21

court." ). This claim is dismissed.

**D. <u>Suppression</u>**

Petitioner next claims that the gun and his statement to police should have been suppressed because police entered his home without a warrant, arrested him, and recovered the gun as a result of statements he made to police.  Dkt. No. 1 at 5, Ground Two.

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494. *See also Pina v. Kuhlmann*, 239 F. Supp. 2d 285, 289 (E.D.N.Y. 2003) ("It is well settled that [Fourth Amendment] claims are not cognizable for habeas corpus review where a State has provided a full and fair opportunity to litigate this issue."). The Supreme Court has since extended *Stone* to preclude habeas review of a "Fourth Amendment challenge to the introduction of a confession made after an allegedly unlawful arrest." *Glover v. Herbert,* 431 F. Supp. 2d 335, 338 (W.D.N.Y. 2006) (citing *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983)(*per curiam*)(reversing grant

22

of habeas corpus where circuit court of appeals had found that there was an unattenuated causal link between the custodial statements made by respondent and a violation of the Fourth Amendment)). Thus, *Stone* bars habeas review of claims that statements made during or after an allegedly unlawful arrest should have been suppressed as fruit of an illegal arrest. *Cardwell,* 461 U.S. at 572-73, *Glover,* 431 F. Supp. 2d at 338.  Following *Stone*, review of Fourth Amendment claims in habeas petitions is permissible only: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992); *see also Ramdeo v. Phillips*, No. 04-CV-1157, 2007 WL 1989469, at *27 (E.D.N.Y. Jul. 9, 2007).

New York has a corrective procedure for Fourth Amendment violations, which is facially adequate. *See* CPL § 710; *Capellan,* 975 F.2d at 70 n.1. Under CPL § 710, a defendant may move to suppress evidence he claims was unlawfully obtained when he has "reasonable cause to believe that such [evidence] may be offered against him in a criminal action."

*Huntley v. Superintendent, Southport Corr. Fac.*, No. 00-CV-191, 2007 WL 319846, at *7 (N.D.N.Y. Jan. 30, 2007)(Hurd, J., adopting Report - Recommendation of Lowe, M.J.)(quoting CPL § 710.20).  Petitioner availed himself of that procedure by making a motion to suppress his statements and the gun in state court.  Hearing Tr. at 3-233.  The trial court denied these motions after a lengthy hearing, and Petitioner appealed that denial. Further, having reviewed the record, there was no unconscionable breakdown in the underlying process. *Capellan*, 975 F.2d at 72 ("[A] mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process.") Petitioner's claim is barred by *Stone* and *Cardwell* and it is dismissed.

## E. **Right to Present a Defense**

Petitioner next claims that the trial court violated his due process right to present evidence in support of his defense when it refused to admit Davis's alleged statement to a third party that she killed the victim as substantive evidence.  Dkt. No. 1 at 6 (Ground Three); Dkt. No. 21, Reply Mem. at 7-18. Petitioner also argues that the court's ruling was contrary to or an unreasonable application of the Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973). Dkt. No. 21, Reply Mem. at

7-16.

Defense counsel sought to admit as substantive evidence Davis's

alleged statement to Francine Vero that she shot the victim on the ground

that the statement qualified as an excited utterance. Trial Tr. at 533-34.  In

support of that argument, counsel asserted that Davis testified that she did

not sleep during the fifteen hours in question, that during that time she was

"numb," and that the phone conversation with Vero took place while police

were leading Petitioner out of her apartment.  *Id.* at 536-37.  Counsel

argued that these factors pointed to the conclusion that Davis did not have

any time for "studied reflection."  *Id.* at 537-38. The trial court denied

counsel's request to admit the statement for its truth under the excited

utterance exception and instead permitted counsel to elicit the statement

through Vero's testimony for the purpose of assessing Davis's credibility.

*Id.* at 542-43, 555.  The court's decision was based upon the fact that fifteen

hours had lapsed, and Davis was "thinking" and acting in a manner to

suggest that the statement was not an excited utterance.  *Id.* at 542-43.

The Court of Appeals affirmed the Appellate Division's determination that

Davis's statement to Vero was not an excited utterance because Davis

indicated during her testimony that she was "thinking clearly" after the

25

incident and during the fifteen-hour period in question, "she moved the gun which defendant had left on top of her computer to a concealed location and moved the garbage bag into which defendant had placed [the victim's] wallet from her bedroom outside to the curb." *Hansen*, 736 N.Y.S.2d at 748; *see Hansen*, 786 N.E.2d at 25 n.6.[10]  The Court also ruled that it considered "defendant's remaining contentions and to the extent they are preserved, find them without merit." *Hansen*, 786 N.E.2d at 25. Those determinations are entitled to AEDPA deference. *See Anderson v. Superintendent, Elmira Corr. Fac.*, No. 05-1586-pr, 2008 WL 162842, at *3 (2d Cir. Jan. 18, 2008)(summary order)(use of language by state court that a petitioner's claims are "either unpreserved for appellate review or without merit" creates the presumption that the state court adjudicated the claim on the merits); *Jimenez v. Walker,* 458 F.3d 130, 146 (2d Cir. 2006)(A state

---

[10]Petitioner also argued, for the first time on appeal, that the prosecutor "opened the door" to the admission of Davis's statement for its truth during his direct examination of Davis. Dkt. No. 11, Ex. B, 40-44; Ex. G, 46-50. The Court of Appeals affirmed the Appellate Division's finding that appellate review of this claim was precluded because Petitioner did not "raise this argument before County Court." *Hansen*, 736 N.Y.S.2d at 749. By finding that the claim was unpreserved the Court of Appeals based the denial of this claim on an adequate and independent state ground. To the extent that Petitioner now re-asserts this claim in his Reply Brief (Dkt. No. 21 at 11), without establishing cause for the failure to raise it in state court or resulting prejudice, it is procedurally barred. *See Murray v. Carrier*, 477 U.S. 478, 485 (1986) ( "[A] federal habeas petitioner who has failed to comply with a State's contemporaneous-objection rule at trial must show cause for the procedural default and prejudice attributable thereto in order to obtain review of his defaulted constitutional claim."); *Garcia v. Lewis*, 188 F.3d 71, 78-79 (2d Cir.1999) ( "[W]e have observed and deferred to New York's consistent application of its contemporaneous objection rules.").

26

decision that a claim is either unpreserved for review or without merit is

"deemed to rest on the merits of the federal claim.").

The opportunity to present a complete defense, including the right to

call witnesses and present testimony, is one of the constitutional

requirements of a fair trial. *Hawkins,* 460 F.3d at 243 (citing *Crane v.*

*Kentucky*, 476 U.S. 683, 690 (1986)); *Wade v. Mantello*, 333 F.3d 51, 57

(2d Cir. 2003); *Jones v. Stinson,* 229 F.3d 112, 120 (2d Cir. 2000); *Persad*

*v. Conway*, No. 05-CV-4199, 2008 WL 268812, at *17 (E.D.N.Y. Jan. 30,

2008). This right "necessarily implicates state evidentiary rulings[.]" *Morales*

*v. Portuondo*, 154 F. Supp. 2d 706, 722 (S.D.N.Y. 2001); *see Hawkins,* 460

F.3d at 243. Trial courts have wide discretion when deciding whether to

admit or exclude evidence, but they "may not arbitrarily and irrationally

apply evidentiary rules in a mechanical fashion to exclude material, reliable,

exculpatory evidence." *Persad,* 2008 WL 268812, at *17 (quoting *Morales*

*v. Smith*, No. 05-CV-1104, 2005 WL 2367621, at *6 (E.D.N.Y. Sept. 27,

2005)); *see Chambers*, 410 U.S. at 302 ("where constitutional rights directly

affecting the ascertainment of guilt are implicated, the hearsay rule may not

be applied mechanistically to defeat the ends of justice."); *Hawkins*, 460

F.3d at 243 (stating that the Supreme Court "has found unconstitutional the

27

rigid application of state evidentiary rules prohibiting presentation" of exculpatory evidence)(quoting *Wade*, 333 F.3d at 57); *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir.1988) (A habeas court must determine whether the excluded evidence "was material to the presentation of the defense so as to deprive the defendant of fundamental fairness.").

The Second Circuit has established a two-step process for determining whether the exclusion of evidence violates a petitioner's right to present a defense.  *Hawkins*, 460 F.3d at 244; *Collins v. Barto*, No. 05 Civ. 9387, 2007 WL 2398778, at *8 (S.D.N.Y. Aug. 14, 2007).  Courts must first "start with the 'propriety of the trial court's evidentiary ruling.' " *Hawkins*, 460 F.3d at 244 (quoting *Wade*, 333 F.3d at 59). If the state court's evidentiary ruling was correct, habeas review is limited to whether the evidentiary rule is " 'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.' " *Hawkins*, 460 F.3d at 244 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)(quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). To meet this standard, the evidentiary rule must have infringed on a "weighty interest" of the petitioner.  *Id.*

If exculpatory evidence was erroneously excluded, the court must then determine if the error deprived the petitioner of a fundamentally fair

28

trial.  The test for fundamental fairness is "whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.' " *Hawkins,* 460 F.3d 244 (quoting *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996)(quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *see Rosario*, 839 F.2d at 925; *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985); *Gilfus v. Vargason*, Nos. 04-CV-188, 04-CV-189, 04-CV-190, 2008 WL 65579, at *8 (N.D.N.Y. Jan. 3, 2008)(Hurd, J., adopting Report - Recommendation of Treece, M.J.).

The state court did not commit constitutional error.  First, Petitioner has failed to show that the trial court's evidentiary ruling was erroneous. The excited utterance hearsay exception is firmly rooted under both New York and federal law. *Lilly v. Virginia*, 527 U.S. 116, 126 (1999); *White v. Illinois*, 502 U.S. 346, 350 n.1, 355 n.8 (1992); *People v. Brown*, 517 N.E.2d 515, 517-18 (N.Y. 1987). "An excited utterance is one made 'under the immediate and uncontrolled domination of the senses, and during the brief period when consideration of self-interest could not have been brought fully to bear by reasoned reflection.' " *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004)(quoting *People v. Vasquez*, 670 N.E.2d 1328, 1336-37 (N.Y. 1996) (quoting *Brown*, 517 N.E.2d at 517)). The statement must have been

made before the declarant had the opportunity to reflect on the shocking

incident. *Id.* There is no requirement under New York or federal law that an

excited utterance must occur within a specific time frame after the event in

question.  *See United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990)

("The length of time between the event and the utterance is only one factor

to be taken into account " when determining if the declarant was still under

the stress of the event in question). The relevant inquiry is whether the

utterance occurred in a "moment of excitement - without the opportunity to

reflect on the consequences of one's exclamation." *Roman v. Filion*, No. 04

Civ. 8022, 2005 WL 1383167, at *29 (quoting *White v. Illinois*, 502 U.S. at

356); *see People v. Carroll*, 740 N.E.2d 1084, 1089 (N.Y. 2000)(courts must

determine whether the startling event rendered the declarant's " 'normal

reflective processes inoperative' preventing the opportunity for deliberation

and fabrication.")(quoting *Vasquez*, 670 N.E.2d at 1336-37).

Fifteen hours passed between the shooting and the phone call

between Davis and Vero. In addition to the amount of time that passed, the

record supports the state court's determination that Davis's actions

mitigated against a finding that her statement was made without reflection

or deliberation. Davis testified that "[a]fter what happened I believe I was

thinking clearly." Trial Tr. at 409. She took affirmative steps to hide not only her possession of marijuana, but the gun used in the shooting. Davis testified that at some point, her cousin moved the gun and hid it in the ceiling at her request. *Id.* at 420-21. The gun belonged to Davis's mother, and when her mother asked her where the gun was, Davis lied to her and said she did not know. *Id.* at 422. Additionally, Petitioner threw the wallet into a garbage bag in Davis's room, and, although Davis testified she was going to take the garbage out but did not recall doing so, police recovered the wallet from the trash in front of the Davis home. *Id.* at 245, 265-66, 388. After the phone conversation with Vero, Davis testified that she returned to her room, retrieved marijuana hidden there, and took it to a friend's house. *Id.* at 389. These actions belie any claim that Davis was unable to deliberate and reflect.

Petitioner did not identify any other hearsay exception that would have permitted Vero to testify to Davis's out-of-court statement as substantive evidence. *See Hawkins*, 460 F.3d at 246 (citing *Tyrrell v. Wal-Mart Stores, Inc.*, 762 N.E.2d 921, 922 (2001)("Our law is well settled. The proponent of hearsay evidence must establish the applicability of a hearsay-rule exception."). The trial court properly admitted Vero's testimony for

31

impeachment purposes because it allowed the jury to assess her credibility. *McLean v. McGinnis*, 29 F. Supp. 2d 83, 94 (E.D.N.Y. 1998), *aff'd* No. 98-3753, 1999 WL 642925 (2d Cir. Aug. 20, 1999)(slip. op.). Its finding that Davis's statement was not an excited utterance and therefore admissible only for impeachment purposes was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

Nonetheless, Petitioner argues that Davis's statement should have been admitted as substantive evidence under *Chambers* because it bore adequate indicia of reliability and, had it been admissible as substantive evidence, it would have "created a reasonable doubt" that did not otherwise exist.  Dkt. No. 21, Reply Mem. at 7-16. He asserts that the trial court's ruling therefore infringed upon his right to present a defense. *Id.*

In *Chambers*, the defendant was charged with murder in connection with the shooting death of a police officer, but claimed another person, Gabe McDonald, was the shooter.  Chambers presented evidence that one witness saw McDonald shoot the victim, and a second witness saw McDonald with a pistol immediately after the shooting in support of his defense. *Chambers*, 410 U.S. at 289. Chambers also called McDonald as a

witness.  McDonald testified that although he confessed in writing to the

shooting, the confession was false, and he confessed only on the promise

of a reverend that he would not go to jail and would share in a civil tort

recovery. *Id.* at 291. The state court would not permit Chambers to treat

McDonald as an adverse witness and cross-examine him regarding his

confession based upon Mississippi's common-law rule that a party may not

impeach his own witness.  *Id.* at 291, 295.[11]  Chambers also sought to admit

testimony from three witnesses to whom McDonald admitted he was the

shooter.  The state objected to the testimony of all three witnesses on the

ground that their testimony was hearsay, and the trial court sustained the

objections, refusing to permit Chambers to call them. *Id.* at 293-94, 298.

The Supreme Court held that the hearsay statements of these

witnesses "provided considerable assurance of their reliability" because

each statement was made spontaneously by McDonald to a close

acquaintance shortly after the shooting, each statement was corroborated

by other evidence, including McDonald's sworn confession and eyewitness

---

[11]At the time Chambers was decided, Mississippi law did not recognize statements against penal interest as an exception to the hearsay rule. *See Chambers*, 410 U.S. at 299.

testimony that McDonald was the shooter and was seen with a gun immediately after the shooting, and the state court's refusal to permit them to testify violated the Sixth Amendment right to present witnesses. *Id.* at 298, 300. The Supreme Court also stated that if there was any question about the truthfulness of the statements, McDonald was present in the courtroom and could be cross-examined by the state. *Id.* at 301.  The Court ruled that the exclusion of the evidence, "coupled with the State's refusal to permit Chambers to cross-examine McDonald" resulted in the denial of a fair trial and due process. *Id.* at 302.

In *Chambers*, unlike the present case, there was substantial evidence of the reliability of the declarant's out-of-court statements, which were consistently repeated to three separate witnesses, were memorialized in a sworn written confession, and were corroborated by eye-witness testimony that the declarant was the shooter and was seen holding a gun immediately after the shooting.  *Chambers*, 410 U.S. at 300-02.  In contrast, Davis is alleged to have made a single statement in a phone conversation with Vero that she shot the victim. Trial Tr. at  390, 414-16, 551-52.  Additionally, the evidence suggests that Davis had a reason to fabricate the alleged

34

statement to Vero.  Detective Severance testified that he asked Petitioner

about Davis's involvement upon learning of her alleged statement to Vero.

Petitioner "sort of snickered and just said, 'No.  She's just trying to protect

me.  I'm the one that shot him."  Trial Tr. at 324.  Davis's alleged statement

lacked sufficient indicia of reliability to have permitted its admission as

substantive evidence.

Furthermore, the record does not support Petitioner's claim that the

state court's evidentiary ruling deprived him of his right to present a

defense.  Petitioner presented the very defense he now asserts was

precluded - that Davis was the real shooter.  In sharp contrast to *Chambers*,

Petitioner's cross-examination of Davis, including the line of questioning

concerning her alleged statement to Vero, was virtually unrestricted.  *See*

Trial Tr. at 392-431.  Moreover, unlike Chambers, Petitioner was permitted

to call Vero to testify to Davis's statement.  Trial Tr. at 544-55.

There is, of course, a distinction between impeachment evidence and

substantive evidence.  *See United States v. Rechnitzer*, 05-CR-368, 2007

WL 676671, at *6 (N.D.N.Y. Feb. 28, 2007)(Homer. M.J.)("Impeachment

evidence does not constitute substantive evidence of guilt.").  In this case,

however, this distinction would not have created a reasonable doubt that did

not otherwise exist.

Although the evidence was admitted only for impeachment purposes,

the jury heard Davis deny telling Vero that she, and not Petitioner, shot the

victim.  It also heard Vero's testimony to the contrary. Counsel argued

extensively to the jury that all of the evidence pointed to Davis as the

shooter, and that Petitioner took the blame to protect her.  Counsel also

argued that Davis testified against Petitioner to protect her plea agreement,

that the gun belonged to Davis's mother and that Davis stole it and admitted

carrying it for a month prior to the shooting, the gun and wallet were found

at Davis's apartment, and that Vero had no reason to fabricate a story

implicating Davis in the shooting and no reason to protect Petitioner.  *Id.* at

610-23.  Thus, Petitioner had the opportunity to argue to the jury that Davis

was the real shooter. The jury almost certainly did not find Petitioner guilty

of murder beyond a reasonable doubt while simultaneously believing that

Davis had lied on the witness stand when she denied confessing that she

killed the victim. If the jury believed that Davis's testimony had been

successfully impeached, and that Davis had in fact confessed to Vero that

she shot the victim, that belief could surely have been the basis for a finding of reasonable doubt. The jury would be free to draw this conclusion, or decline to draw it, whether it viewed Davis's testimony substantively or only for impeachment purposes. *See, e.g., McLean*, 29 F. Supp. 2d at 98-99 (although hearsay evidence in support of a defense theory that a third party committed the crime should have been admitted as impeachment evidence, any error was harmless because the petitioner was not prevented from presenting the defense through indirect evidence); *see also Fryar v. Bissonnette*, 318 F.3d 339, 342 (1st Cir. 2003)("We agree with the district court that the jury almost certainly did not find Fryar guilty of murder beyond a reasonable doubt while simultaneously believing that Barklow had lied on the witness stand when he denied confessing to the murder.").

In sum, the state court's evidentiary rulings were sound under New York law, and did not rise to the level of a constitutional violation. There is no basis to find that the state court's rejection of Petitioner's claim was an unreasonable application of clearly established federal law. Accordingly, this claim is dismissed.

### F. **Sentencing**

Petitioner next claims that his sentence of life without parole violates due process and equal protection because the trial court was not required to find any aggravating or mitigating factors prior to imposing sentence and he was not entitled to a sentencing jury. Dkt. No. 1 at 6, Ground Four. Petitioner is apparently arguing that he, as a non-capital defendant, should have been given the same protections during sentencing that capital defendants receive.

Sentencing procedures must satisfy the requirements of constitutional due process. In order to show that his due process rights had been violated at sentencing, a petitioner must show that the sentence was based upon "misinformation" or "materially untrue" statements. *Jones v. Donnelly,* 487 F. Supp. 2d 403, 416 (S.D.N.Y. 2007)(quoting *People v. Naranjo*, 681 N.E.2d 1272, 1272 (N.Y.1997)); *see Roberts v. United States*, 445 U.S. 552, 556 (1980)(sentence will violate due process if it is imposed on the basis of "misinformation of a constitutional magnitude.")(quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972) (citing *Townsend v. Burke*, 334 U.S. 736, 741 (1948)); *Hili v. Sciarrotta*, 140 F.3d 210, 213 (2d Cir. 1998)(noting that defendants have a due process right not to be punished on the basis of

38

false information); *McClarin v. Smith,* No. 05-CV-2478, 2007 WL 2323592, at *20 (E.D.N.Y. Aug. 10, 2007)(to show that a sentence violated due process, a petitioner must show the judge relied upon misinformation). While a petitioner need not show that the sentencing court actually relied upon misinformation when it imposed sentence, there must be a showing that reliance upon an improper factor was "quite probable."  *King v. Hoke*, 825 F.2d 720, 724 (2d Cir. 1987)(quoting *McGee v. United States*, 462 F.2d 243 (2d Cir. 1972)). Defendants must also be given "an effective chance to respond to the information presented to the sentencing court[.]" *Jones*, 487 F. Supp. 2d at 416 (quoting *Arocho v. Walker*, No. 01 Civ. 1367, 2001 WL 856608, at *4 (S.D.N.Y. Jul. 27, 2001)).

The Court of Appeals rejected Petitioner's argument that the difference in treatment of capital and non-capital defendants violated either due process or equal protection.  *Hansen*, 786 N.E.2d at 22-25. *See also Holland v. Donnelly*, 324 F.3d 99, 110 n.2 (2d Cir. 2003)(per curiam)(noting that in *Hansen*, the New York Court of Appeals "unanimously rejected" an equal protection challenge to CPL § 400.27). It noted that the Supreme Court rejected a similar argument that the heightened standard of due

39

process applicable in capital cases "because of the qualitative difference between death and all other penalties" should be extended outside the capital context in *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991). *Id.* at 23. *See Harmelin*, 501 U.S. at 996 ( "We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."). The court then correctly identified the appropriate standard in non-capital cases, noting that due process was satisfied so long as the sentencing scheme ensured that the defendant was not sentenced based upon " 'materially untrue' facts or misinformation" and the defendant had an opportunity to "respond to the facts upon which the court may base its decision." *Id.* at 345 (quoting *Naranjo*, 681 N.E.2d 1272).  New York's sentencing scheme comported with due process requirements, the Court stated, because it established procedural safeguards, such as the requirements that the court order a pre-sentence investigation and the defendant be permitted to make a statement before the imposition of sentence.  *Id.* at 345-46.

The Court found that although counsel presented numerous objections to the sentencing proceeding, he did not argue that the sentence

was "based on materially untrue assumptions or misinformation, or that [petitioner] lacked notice or opportunity to contest the facts upon which the court relied." *Hansen*, 786 N.E.2d at 25.  *See* Dkt. No. 21, Appx., at A310-323. That finding is supported by the record.

The sentencing court reviewed defense counsel's motions to set aside the verdict, which included his constitutional challenges to the sentencing procedure, and the prosecutor's response, and denied the motions.  Dkt. No. 21, Appx. at A-319-21.  The court based its sentence upon the fact that Petitioner was convicted by "a jury of twelve people" of "having killed another human being intentionally during the course of a felony."  *Id.* at A-321.  Thus, the trial court based Petitioner's sentence on factors that were proper for the trial court to consider. Since there is no basis in the record to conclude that the court relied upon any improper facts or misinformation when it imposed sentence, and Petitioner had an opportunity to be heard, his due process challenge to the sentencing procedure is denied.

Petitioner's equal protection claim also fails. When Petitioner was convicted of first-degree murder in 1999, New York law authorized three sentences for that crime - death, life imprisonment without parole, and an

indeterminate sentence of at least twenty years to life with the possibility of parole. N.Y. PENAL LAW §§ 60.06, 70.00(2)(a), (3)(a)(I).  CPL § 400.27 sets forth the procedure for determining which sentence would be imposed.  In cases where a jury found a defendant guilty of first degree murder and the prosecutor sought the death penalty, a separate sentencing hearing was conducted before the same jury. *See* CPL § 400.27(2).  The jury then determined beyond a reasonable doubt whether the aggravating factors presented in support of the death penalty outweighed any mitigating factors to determine whether the death penalty is appropriate.  CPL § 400.27 (2), (6)-(10).  If the jury determined that the death penalty was appropriate, the judge was required to impose it. *Id.* at (11)(d). If the jury determined that life without parole was appropriate, the judge was required to impose that sentence.  *Id.* at (11)(e).  If a jury could not reach a unanimous decision, the judge was then required to sentence the defendant according to ordinary indeterminate sentencing provisions having a minimum sentence between twenty and twenty-five years and a maximum sentence of life. CPL § 400.27 (11)(c); N.Y. PENAL LAW § 70.00 (2)(a), (3)(a)(I).  In cases like Petitioner's, where the prosecutor did not seek the death penalty, no special sentencing

42

proceeding was required.  The judge had discretion to sentence a

defendant to either life without parole or an indeterminate sentence having

a minimum sentence between twenty and twenty-five years and a maximum

sentence of life in prison. CPL § 400.27(1).

The Court of Appeals rejected Petitioner's equal protection challenge

to CPL § 400.27, finding that it was "subsumed by the due process claim."

*Hansen*, 786 N.E.2d at 23, n.3 (citing *Chapman v. United States*, 500 U.S.

453, 465 (1991)(Noting that in the context of an argument that the sentence

imposed was based on an arbitrary distinction that would violate the Due

Process Clause, "an argument based on equal protection essentially

duplicates an argument based on due process.")). *See, e.g., Jones v.*

*United States*, 463 U.S. 354, 363 n.10 (1983)("If the Due Process Clause

does not require that an insanity acquittee be given the particular

procedural safeguards provided in a civil-commitment hearing . . . then

there necessarily is a rational basis for equal protection purposes for

distinguishing between civil commitment and commitment of insanity

acquittees.").

Moreover, the Second Circuit has explicitly rejected Petitioner's

argument that CPL § 400.27 violates the equal protection clause, finding

that while the capital and non-capital sentencing procedures operate

differently, "the options provided within each sentencing system are rational

in light of the different goals and problems pursued in death and non-death

cases." *Holland,* 324 F.3d at 101 (affirming *Holland v. Donnelly*, 216 F.

Supp. 2d 227, 250-51 (S.D.N.Y. 2002)). Accordingly, the state court's

rejection of this claim was not contrary to or an unreasonable application of

clearly established Supreme Court precedent, and Petitioner's equal

protection claim is dismissed.


**IV.  Certificate of Appealability**

For the reasons stated, Petitioner's § 2254 petition (Dkt. No. 1) is

denied in its entirety, and this action is dismissed. No certificate of

appealability shall issue because Petitioner has failed to make a

"substantial showing of a denial of a constitutional right" pursuant to 28

U.S.C. § 2253(c)(2)("A certificate of appealability may issue . . . only if the

applicant has made a substantial showing of the denial of a constitutional

right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107,

44

112 (2d Cir. 2000).

**WHEREFORE,** after reviewing Petitioner's submissions and the

relevant law, and for the reasons stated herein, the Court hereby

**ORDERS** that Petitioner's petition for a writ of *habeas corpus* is

**DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of his Order

on Petitioner and counsel by regular mail.

**IT IS SO ORDERED.**

Albany, New York
August 20, 2008

Gary L. Sharpe
U.S. District Judge

45